UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
MOMODU JALLOH,                    )
        Plaintiff,               )
                                  )        CIVIL ACTION NO.
            v.                    )        04-11403-DPW
                                  )
DEPT. OF HOMELAND SECURITY,       )
        Defendant.               )
```

MEMORANDUM AND ORDER
March 11, 2005

Petitioner Momodu Jalloh seeks review in this court of the denial of his application for naturalization as a United States citizen by the Department of Homeland Security ("DHS").  Mr. Jalloh's application was rejected on grounds that he had failed to demonstrate that he had been and continued to be a person of good moral character.  The stated concern was a criminal assault and battery case that was ultimately dismissed.  For the reasons set forth more fully below, after de novo evaluation of the denial of the application and consideration of the parties' submissions, including Mr. Jalloh's testimony during an evidentiary hearing, I conclude that Mr. Jalloh has met his burden and, therefore, that his application was wrongfully denied.  Accordingly, I will remand the matter to the Department of Homeland Security with direction to take action within 45 days consistent with my determination.

## I. BACKGROUND

Mr. Jalloh, a fifty-four year old native of the west African

-1-

nation of Sierra Leone, applied to the Immigration and
Naturalization Service ("INS")[1] for naturalization on November
1994 and again in September 1995.  Following an initial
examination of Mr. Jalloh's application, which included a May 8,
1996 interview with an INS officer, the application was denied on
March 1, 1997 for lack of prosecution, apparently as a result of
a failure by Mr. Jalloh to provide additional information about
his family.

Pursuant to Section 336 of the Immigration and Nationality
Act (the "Act"), on May 30, 1997, Mr. Jalloh filed a "Request for
Hearing on a Naturalization Decision."  The request for hearing
was granted and on February 19, 1998, Mr. Jalloh had a second
interview, this time with a different INS officer, regarding his
administrative appeal.  On or about April 26, 1999 -- which was
between the date of his second interview and the administration
of his oath of allegiance -- Mr. Jalloh was arrested and charged
with the crime of assault and battery with a dangerous weapon.
The circumstances of that arrest were as follows.

Mr. Jalloh was working at the time as a taxi driver for
Independent Taxi.  On the evening of April 26, 1999, he was sent

---

[1] Pursuant to the Homeland Security Act of 2002, the
functions of the Immigration and Naturalization Service ("INS")
were transferred to the newly-formed Department of Homeland
Security ("DHS").  The immigration service -- as opposed to the
immigration enforcement -- functions of INS relevant to this
action were delegated to the Bureau of Citizenship and
Immigration Service ("CIS") within the DHS.  6 U.S.C. § 271
(2004).

by his dispatcher to pick up a fare at 94 Creston Street in the
Dorchester neighborhood of Boston.  Mr. Jalloh drove his
passenger, a teenage girl, to her destination on Coleman Street
in Dorchester.  Upon arriving at the destination, the passenger
explained that she did not have enough money with her to pay the
fare, which, according to the meter, was $5.25.  The passenger
asked Mr. Jalloh to wait in the car while she went inside to get
more money.  Mr. Jalloh agreed to do so, and kept the meter
running while waiting for his passenger to return.  By the time
the passenger and her mother emerged from the building to pay the
fare, the meter read $6.00.

     The passenger's mother gave Mr. Jalloh $10.00 and he
returned $4.00 in change to her.  The mother disputed the
transaction, claiming that more change was due because the fare
was only $5.25.  Mr. Jalloh then released the brake on his taxi
cab, intending to drive away, and the car started rolling
forward.  Unbeknownst to Mr. Jalloh, as he released the brake his
passenger was reaching into the rear of the car through an open
window in order to retrieve her pocketbook, which she had left on
the back seat when she went inside to get money for the fare.  As
soon as he appreciated what was going on, Mr. Jalloh stopped the
car.  The passenger claimed she was hurt and, along with her
mother and brothers -- one of whom appeared in the street bearing
a baseball bat and told Mr. Jalloh that he "wasn't going
anywhere" -- began berating Mr. Jalloh.  Mr. Jalloh told them

-3-

that he was not planning to go anywhere and called his dispatcher
to report what was going on.

By the time the police arrived on the scene, the passenger
and her family were screaming for Mr. Jalloh to be arrested.  An
ambulance was called for the passenger, but she declined a ride
to the hospital.  Mr. Jalloh attempted to explain to the police
what had happened, but nevertheless was arrested and transported
to the police station where he was charged with assault and
battery with a dangerous weapon.  Mr. Jalloh was released on
$36.00 bail later that evening.

Following consultation with his court-appointed counsel, Mr.
Jalloh admitted to sufficient facts regarding the offense in
Dorchester District Court on July 8, 1999.[2]  The matter was

---

[2]Mass. R. Crim. P. 12(a)(2) provides that a defendant in a
District Court action "may, after a plea of not guilty, admit to
sufficient facts to warrant a finding of guilty," the course Mr.
Jalloh elected to dispose of the matter in the Dorchester
District Court.  Pursuant to Mass. Gen. Laws ch. 278, § 18 --
which governs the entry of pleas, requests for specific
dispositions, and pretrial motions -- an "admission to facts
sufficient for finding of guilt . . . shall be deemed a tender of
a plea of guilty for purposes of this section."  See Mateo v.
United States, Nos. 03-2409, 03-2472, 2005 WL 388272, at *2 n.3
(1st Cir. Feb. 18, 2005); United States v. Morillo, 178 F.3d 18,
21 (1st Cir. 1999); Luk v. Commonwealth, 421 Mass. 415, 418 n.6
(1996).  By admitting to sufficient facts, Mr. Jalloh waived the
following rights: "the right to a trial with or without jury, the
right to confrontation of witnesses, the right to be presumed
innocent until proven guilty beyond a reasonable doubt, and the
privilege against self-incrimination."  Mass. R. Crim. P.
12(c)(3)(A).  Before Mr. Jalloh's admission of sufficient facts
was accepted, the District Court was required to inform him both
of the rights he was waiving by making the admission and of the
potential consequences of the admission, Mass. R. Crim. P.
12(c)(3), as well as to determine that the admission was made

continued without a finding for one year and thereafter was

dismissed on July 7, 2000 upon the recommendation of the state

probation department.[3]

By letter dated June 14, 2004 (over five years after his

last encounter with immigration authorities at his second

interview[4]), Mr. Jalloh was informed by the Bureau of Citizenship

---

"voluntarily with an understanding of the nature of the charge
and the consequences of the . . . admission." Mass. R. Crim. P.
12(a)(3).  Mr. Jalloh has not alleged that the presiding District
Court judge erred in this regard.

[3]The ultimate dismissal of the case under these
circumstances demonstrates the role of the continued without a
finding procedure as a form of diversionary disposition in
Massachusetts criminal practice.  The Dorchester District Court
proceeding functioned essentially as a probationary term during
which Mr. Jalloh demonstrated that there was no need to pursue
the assault and battery charge to decision on the merits because
his conduct during the subsequent year established no basis for
concern about anti-social behavior.

[4]The unexplained delay by the CIS in taking further action
on Mr. Jalloh's application following his second interview lasted
so long that by the time the CIS notified him on June 14, 2004
that it was denying his application, more than five years had
passed since the date of the conduct that provided the basis for
the denial.  This is relevant because under the Immigration and
Nationality Act, an applicant for naturalization is required to
demonstrate, inter alia, that he was during the five years
immediately preceding the filing of his application, and
continues to be, a person of good moral character. 8 U.S.C. §
1427(a).  In other words, the CIS delayed for so long in acting
upon Mr. Jalloh's application that by the time it got around to
rendering a final decision, the conduct upon which it based its
denial was so temporally distant that it fell outside of the
statutorily prescribed look-back period and therefore would not
necessarily be considered were Mr. Jalloh to file a new
application for naturalization.  The CIS informed Mr. Jalloh in
the June 14, 2004 denial letter that "[i]t should be noted that
you may be eligible to file a new application for naturalization
on April 26, 2004," and raised the point again in a footnote in
its opposition to Mr. Jalloh's request for mandamus relief.

-5-

and Immigration Service of the Department of Homeland Security
("CIS")[5] that the initial denial of his application had been
affirmed on different grounds.  Referencing the Dorchester
District Court matter, which had been dismissed four years
earlier -- and as to which Mr. Jalloh had never been confronted
or afforded an opportunity to be heard by immigration authorities
as to extenuating circumstances -- the CIS relied for the denial
upon 8 C.F.R. § 316.19(b)(3)(iii), which provides that "an
application will not be approved if an applicant has committed
unlawful acts that adversely reflect upon the applicant's moral
character."  The final paragraph of the letter informed Mr.
Jalloh that "[t]his decision constitutes a **final administrative
denial** of your naturalization application" (emphasis in
original), and also notified him of his right to petition the
United States District Court having jurisdiction over his place
of residence for review of the decision within the next 120 days.

Mr. Jalloh immediately filed his request for review with
this Court.  An evidentiary hearing was held on February 1, 2005.
During the course of the hearing, Mr. Jalloh, who was proceeding
pro se, offered testimony regarding extenuating circumstances
surrounding the April 26, 1999 incident and responded to

---

Apparently heeding this advice, sometime in late 2004 Mr. Jalloh
filed a new application for naturalization and paid the
associated filing fee.  According to counsel for DHS, the
processing of the new application could take up to ten years.

[5]See footnote 1, supra.

questions on other relevant matters from the Court and counsel
for the government.  As noted above, the CIS had denied Mr.
Jalloh's application without giving him the opportunity to detail
the facts and circumstances surrounding his arrest; the hearing
in this court, therefore, was his first occasion to do so.

## II. ANALYSIS

A. <u>Subject Matter Jurisdiction</u>

An applicant seeking to become a naturalized United States
citizen may appeal the denial of his application by the CIS to
the United States District Court for the district in which he
resides.  8 U.S.C. § 1421(c); 8 C.F.R. § 310.5(b).  In relevant
part, the Immigration and Nationality Act provides that:

> [a] person whose application for naturalization under
> this subchapter is denied, after a hearing before an
> immigration officer under section 1447(a) of the Title,
> may seek review of such denial before the United States
> district court for the district in which such person
> resides in accordance with chapter 7 of Title 5.  Such
> review shall be de novo, and the court shall make its
> own findings of fact and conclusions of law and shall,
> at the request of the applicant, conduct a hearing de
> novo on the application.

8 U.S.C. § 1421(c).  The petition for review in the district
court must be filed no more than 120 days after the date of the
final determination by the CIS on the application for
naturalization.  8 C.F.R. § 336.9(b).  Before appealing to
district court, an applicant must exhaust the administrative
remedies available to him under Section 336 of the Act.  8 C.F.R.

§ 336.9(d).[6]

   Mr. Jalloh fully exhausted his administrative remedies
before filing his timely request for review in federal court.
Mr. Jalloh's place of domicile is within the jurisdiction of this
Court.  This Court, therefore, has subject matter jurisdiction to
consider Mr. Jalloh's request for review of the denial of his
application for naturalization by the CIS.

B. "Good Moral Character"

   The final denial by the CIS of Mr. Jalloh's application for
naturalization was based on its finding that because of his
criminal conduct during the relevant statutory time period --
which included the time between the examination of his
application and the administration of the oath of allegiance --
he had failed to satisfy his burden of showing that he had been

---

   [6]The processing of an application for naturalization
proceeds as follows: (1) the initial paper application made by
the applicant is examined by a CIS officer who determines whether
it will be approved or denied, 8 U.S.C. § 1446, 8 C.F.R. Part
335; (2) if the CIS fails to make a determination on an
application within 120 days of the examination referenced in (1),
the applicant may apply to the appropriate United States District
Court for relief, 8 C.F.R. § 310.5(a); (3) if the application is
denied following the completion of the examination procedures set
forth at 8 C.F.R. Part 335, the applicant may request a hearing
before an immigration officer, 8 U.S.C. § 1447(a), 8 C.F.R. §
336.2(a); (3a) the request for hearing must be made within thirty
(30) days of the applicant receiving the notice of denial, 8
C.F.R. § 336.2(a); (4) the further review must be conducted by an
officer other than the the one who conducted the initial Part 335
examination and by one classified at a grade level equal to or
higher than that of the original examining officer, 8 C.F.R. §
336.2(b); and (5) if the application is again denied following
this administrative review, the applicant may seek judicial
review of the decision in the appropriate United States District
Court, 8 U.S.C. § 1421(c), 8 C.F.R. § 310.5(b), 8 C.F.R. § 336.9.

and continued to be a person of good moral character.  See 8

U.S.C. § 1472(a), 8 C.F.R. § 316.10(a)(1).

In opposing Mr. Jalloh's request for mandamus relief, the

DHS contended that Mr. Jalloh could not meet his burden of

establishing that he was a person of "good moral character"

during the relevant time period.  In advancing this argument, the

DHS relied, as it did in its final administrative denial, upon 8

C.F.R. § 316.10(b)(3)(iii), which states that:

> (3) Unless the applicant establishes extenuating
> circumstances, the applicant shall be found to lack
> good moral character if, during the statutory period,
> the applicant: . . . (iii) Committed unlawful acts that
> adversely reflect upon the applicant's moral character,
> or was convicted or imprisoned for such acts, although
> the acts do not fall within the purview of Sec.
> 316.10(b)(1) or (2).[7]

---

[7]8 C.F.R. § 316.10(b)(1) provides that:

> (1) An applicant shall be found to lack good moral
> character, if the applicant has been:
>     (i) Convicted of murder at any time; or
>     (ii) Convicted of an aggravated felony as defined
>     in Section 101(a)(43) of the [Immigration and
>     Nationality] Act on or after November 29, 1990.

Section 101(a)(43) of the Immigration and Nationality Act defines
the term "aggravated felony" to mean any of twenty-one enumerated
crimes or categories of crime, including, inter alia: murder,
rape, or sexual abuse of a minor; illicit trafficking in
controlled substances; illicit trafficking in firearms,
destructive devices, or explosive materials; money laundering;
crimes of violence for which the term of imprisonment is at least
one year; counterfeiting; and sabotage.
The relevant section of 8 C.F.R. § 316.10(b)(2) states that:

> (2) An applicant shall be found to lack good moral
> character if during the statutory period the applicant:
> . . .
>     (iv) Admits committing any criminal act covered by
>     paragraphs (b)(2)(i), (ii), or (iii) of this

Id. (emphasis supplied).

In its written response to Mr. Jalloh's petition for mandamus, the DHS entirely glossed over the question of whether the conduct by Mr. Jalloh at issue -- i.e., committing assault and battery with a dangerous weapon -- "fall[s] within the purview of Sec.316.10(b)(1) or (2)."

I find § 316.10(b)(1) inapplicable:  Mr. Jalloh has not been convicted either of murder or of an aggravated felony, as that term is defined by the Act, committed on or after November 29, 1990.

Similarly, § 316.10(b)(2)(iv) does not apply because there was a formal charge, albeit one later dismissed.  Whether the dismissed charge -- assault and battery with a dangerous weapon -- constituted a crime involving moral turpitude under § 316.10(b)(2)(i) requires some analysis.  A discussion of the case law is instructive.

_____

               section for which there was never a formal charge, indictment, arrest, or conviction, whether committed in the United States or any other country.

Sections (i), (ii), and (iii) of 8 C.F.R. § 316.10(b)(2) concern, respectively, crimes of moral turpitude, other than "purely political" offenses, for which the applicant was convicted; offenses for which the applicant was convicted and the aggregate sentence imposed was at least five years, provided that for those offenses committed outside of the United States, the offense was not "purely political"; and violations of any state, federal, or foreign law concerning controlled substances other than a single offense for simple possession of 30 or fewer grams of marijuana.

-10-

Maghsoudi v. INS, 181 F.3d 8 (1st Cir. 1999), provided a general definition of "moral turpitude":

> Moral turpitude refers generally to conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general. Moral turpitude has been defined as an act which is per se morally reprehensible and intrinsically wrong or malum in se, so it is the nature of the act itself and not the statutory prohibition of it which renders a crime one of moral turpitude. Among the tests to determine if a crime involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind.

Id. at 14.

In Nguyen v. Reno, 211 F.3d 692, 695 (1st Cir. 2000), the First Circuit concluded that "assault may or may not be a crime of moral turpitude and that the dividing line is the aggravating element." In Nguyen, the petitioner had been convicted of assault in the second degree, a crime the definition of which required that the defendant intended to and did in fact cause "serious physical injury" to the victim. The court held that the intent and outcome requirements intrinsic to the offense were:

> sufficient for the statutory crime to meet the
> definition of a crime of moral turpitude.  It is
> intrinsically wrong to cause serious injury
> intentionally to another person.  We know of no
> civilian moral code, secular or religious, that permits
> one to seriously injury another person by assault while
> <u>intending</u> to do so.

<u>Id.</u> at 695 (emphasis in original).

Based on the record before me here, I find there was no "aggravating element" involved in Mr. Jalloh's case that would dictate a finding that he had committed a "crime of moral turpitude."  The crime for which Mr. Jalloh was arrested, charged, and admitted sufficient facts -- assault and battery with a dangerous weapon -- required neither an intent to cause "serious bodily injury" nor such an outcome.  <u>See</u> Mass. Gen. Laws ch. 265, §§ 13A, 15B.  The record does not, therefore, seem to support a <u>per</u> <u>se</u> finding that Mr. Jalloh committed a crime involving "moral turpitude."

Indeed, venerable case law in this District suggests that he did not commit such a crime.  <u>Ciambelli ex rel Maranci v.</u> <u>Johnson</u>, 12 F.2d 465, 466 (D. Mass. 1926) (finding that petitioner alien who, while holding a razor, had committed assault and battery on a police officer attempting to break up a group fight in which petitioner was engaged, had not committed crime of moral turpitude because "[i]f one ordinarily law-abiding, in the heat of anger, strikes another, that act would not reveal such inherent baseness or depravity as to suggest the idea of moral turpitude").  <u>But see</u> <u>Yousefi v. U.S. I.N.S.</u>, 260 F.3d 318, 326-27 (4th Cir. 2001) (finding no "appreciable

-12-

difference between assaulting someone with a deadly weapon as
opposed to one that is merely 'dangerous' (and therefore likely
to produce, at the least, serious bodily injury)," holding that
where the former crime was one involving moral turpitude so too
was the latter).

If the assault and battery with which Mr. Jalloh was charged
was not a crime of moral turpitude requiring denial of his
application, the question remains whether what was involved was
an "unlawful act[] that adversely reflect[s] upon [his] moral
character" within the meaning of § 316.10(b)(3), providing the
DHS grounds for denying his application for naturalization.[8]

Through his written submissions and testimony regarding the
circumstances resulting in his being charged with assault and
battery with a dangerous weapon on April 26, 1999, both of which
I find credible, Mr. Jalloh demonstrated that he did not know the
passenger was in harm's way when he released the brake on his
taxi cab, that he never meant to hurt anyone, and that any harm

---

[8]The regulation explicitly contemplates applicants having
the opportunity to demonstrate extenuating circumstances for the
conduct in question and thereby avoid a finding that the good
moral character necessary for the approval of their
naturalization applications is missing.  During the February 1,
2005 hearing on Mr. Jalloh's request for review, counsel for the
DHS agreed that Mr. Jalloh should have had the opportunity to
demonstrate extenuating circumstances regarding the unlawful
conduct at issue before his application was denied.  Recognizing
the need for prompt resolution after an extended delay, the
government offered no objection to Mr. Jalloh providing testimony
on the matter during the hearing.  Mr. Jalloh thereafter
testified to the events that culminated in his arrest on April
26, 1999 for assault and battery with a dangerous weapon.

he caused to the passenger was essentially accidental. The diversionary continued without a finding disposition of the case, see Note 3 supra, corroborates the lack of any meaningfully adverse reflection upon his moral character. On the basis of the record before me, therefore, Mr. Jalloh established that there were extenuating circumstances surrounding the "unlawful acts" upon which his application for naturalization was denied and thus demonstrated that he possesses the good moral character necessary for his application to be approved.[9]

### III. CONCLUSION

For the reasons set forth more fully above, I conclude that Mr. Jalloh's application for naturalization was wrongfully denied by the DHS. Accordingly, the case is hereby remanded to the DHS for processing consistent with this order. The DHS is directed to refund to Mr. Jalloh any and all fees he has paid with respect to the new application for naturalization he filed in 2004. See Note 4 supra.

/s/ Douglas P. Woodlock

---

[9]In response to questioning from the Court and counsel for the DHS, Mr. Jalloh testified: that other than in 1985 -- when he was arrested for conduct related to his being stopped for driving a car, borrowed from a friend, with expired plates (the charges subsequently were dismissed) -- and the 1999 incident discussed supra, he has never been arrested; that he does not use drugs or illegal substances; and that he supports his eighteen-year-old daughter, who lives with him in his apartment in Dorchester, is scheduled to graduate this year from Charlestown High School, and intends to attend college thereafter.

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE